## COMMONWEALTH vs. STEVEN KAPSALIS.

No. 87-1250.

Middlesex. May 10, 1988. — October 12, 1988.

Present: GRANT, CUTTER, & KASS, JJ.

*Rent Control,* Removal of unit from market. *Municipal Corporations,* Rent control. *Cambridge. Practice, Criminal,* Complaint, Amendment, Instructions to jury. *Intent. Evidence,* Intent.

Where a criminal complaint charging a violation of the Cambridge rent control act, St. 1976, c. 36, as amended, made specific reference to § 12 (c) of the act, which itself states that, to invoke criminal sanctions, a violation must be committed "willfully," no prejudice to the defendant resulted from a judge's allowance of the Commonwealth's motion to amend the complaint by adding language expressly alleging that the violation was done "willfully." [454]

With respect to a criminal prosecution under the Cambridge rent control act, St. 1976, c. 36, which dealt with matters arising from much the same alleged conduct as had been the subject of a prior civil contempt proceeding against the defendant, this court concluded that § 11(d) of the act, as amended by St. 1985, c. 399, § 4, did not inflexibly require an "election" between civil and criminal proceedings as mutually exclusive alternatives. [454-455]

A certain regulation of the Cambridge rent control board, requiring owners of rent controlled units to obtain a removal permit before they correct code violations under a renovation permit issued by the city's building department, was not in excess of the regulatory authority conferred on the board by § 5 (c) and (e) of the Cambridge rent control act, St. 1976, c. 36, as amended, and was supported by the provision in § 10 (a) of the act for an exclusive method of judicial review. [455-457]

At the trial of a criminal complaint charging the defendant with a violation of the Cambridge rent control act, St. 1976, c. 36, as amended, and municipal ordinances or regulations thereunder, in that he "did willfully remove a controlled rental unit from the market without a removal permit," the jury could properly find that the defendant intentionally proceeded to remove kitchens from certain newly combined units in violation of the rent control board's explicit conditions set out in a conditional removal permit, and in disregard of warnings from the board's executive director. [457]

At a criminal trial the defendant was not entitled to have the jury instructed that he "cannot be convicted of a crime which involves willfulness if he relied *in good faith* upon the advice of counsel even if the advice . . . [was] an inaccurate construction of the law," where the evidence as to the advice tendered to the defendant by his attorney was not incisive and where there was no explicit evidence that the defendant had relied on the attorney's advice after receiving it. [457-458]

COMPLAINT received and sworn to in the Cambridge Division of the District Court Department on January 9, 1986.

On appeal to the jury session of that division, the case was tried before *Arthur Sherman*, J.

*William P. Homans, Jr.,* for the defendant.

*David R. Marks,* Assistant District Attorney, for the Commonwealth.

CUTTER, J.  On request, made on November 4, 1985, by the general counsel of the Cambridge Rent Control Board (the rent control board), a criminal complaint was issued out of a District Court against Kapsalis. This complaint (as later amended) charged that he "did willfully remove a controlled rental unit from the market without a removal permit in violation of . . . [St. 1976, c. 36] as amended and ordinances or regulations issued thereunder, having previously been found guilty of a like or similar violation."

The Cambridge rent control program is complex. The issues in the present case require consideration of at least one special statute, a Cambridge rent control ordinance as amended, and relevant regulations of the rent control board. Those provisions which seem most significant appear in the appendix to this opinion.

On March 25, 1986, Kapsalis admitted sufficient facts to justify a finding of guilty on the complaint, and a District Court judge imposed a sentence of confinement for one year, six months suspended. An appeal was claimed to the jury session of the District Court on that day. Counsel for Kapsalis then filed on April 9, 1986, a motion to dismiss the amended complaint, which was denied by another District Court judge, who filed findings and rulings and later denied a motion for

reconsideration. The case proceeded to trial before the second District judge and a jury of six. Motions for required findings of not guilty were denied. Certain requested instructions sought by Kapsalis were not given. Kapsalis was found guilty and was given a "six months committed" sentence which thus far has been stayed. He has claimed the appeal before us. It was stipulated that this was a second offense.

We affirm the conviction. The evidence is summarized in the following eight paragraphs. On that evidence, viewed most favorably to the Commonwealth, the jury could have found that Kapsalis wilfully removed one or more controlled rental units from residential use by modification of them (e.g., by removal of kitchens, thereby making them unfit for household use) without obtaining an unconditional removal permit (or permits) from the rent control board as required by that board's regulations and without pursuing the statutory method for judicial review of the board's actions.

Kapsalis owned a building (the locus) at 991 Massachusetts Avenue, Cambridge. Sixteen units above the ground floor were registered as of February 1, 1981, with the rent control board as controlled rental units. The ground floor was commercial space not subject to rent control. Each of the upper floors contained four residential units: two studio apartments, each with only one means of egress, and two three-bedroom apartments, each with two means of egress.

On November 18, 1983, Vincent Clark, a senior housing code enforcement inspector for the city, went to the locus and found numerous sanitary code violations for which he issued citations which stated, among other things, that each studio unit required a second means of egress. In a letter dated January 10, 1984, Joseph Cellucci, the city's commissioner of buildings and housing, informed Kapsalis that lack of a second means of egress rendered each studio unit unfit for human habitation. Commissioner Cellucci ordered that those apartments be vacated. By June, 1984, all eight studio units had been vacated.[1]

---

[1] In June, 1984, the rent control board filed in the Superior Court a complaint against Kapsalis and others which sought a declaration that Kapsalis

On December 4, 1984, the building department issued a status report that Kapsalis had made virtually no progress in correcting the existing code violations. Each studio unit still lacked a second means of egress. By that time, however, the building department (to allow the code violations to be cured) had granted Kapsalis permits (hereafter referred to as "renovation permits" to distinguish them from rent control board removal permits) to perform certain electrical, gas, and heating work, and to make structural alterations.

In the meantime, the rent control board had considered an application by Kapsalis for removal permits (see appendix, *infra*, for provisions of Ordinance No. 966 and the rent control board's regulations under it) to merge each studio unit into its adjacent larger unit. The board on December 10, 1984, granted the removal permits subject to certain conditions (the conditional December, 1984, removal permits), including the following: "(c) the merger of the units be accomplished only by the opening of or removal of the door between the two units, and (d) only one of two kitchens be removed."[2] This record does not show that removal permits unconditionally authorizing combinations of units ever have been granted.

---

had permitted use of the rent controlled upper floors of the locus for non-residential use without obtaining a removal permit for such use from the rent control board. A Superior Court judge granted summary judgment in the rent control board's favor on that complaint. Kapsalis then was enjoined (on November 19, 1985) from allowing the upper floors of the locus to be "used for other than residential purposes without a removal permit." No appeal is shown to have been taken by Kapsalis from this judgment. The rent control board, on February 19, 1986, sought in the Superior Court an order which would hold Kapsalis in contempt of the injunction concerning the locus issued on November 19, 1985.

[2] On December 28, 1984, shortly after the rent control board's ruling, Commissioner Cellucci by letter revoked the renovation permits that had been issued by the city's inspectional services department for renovations to the property, stating that he was acting at the request of the rent control board. Kapsalis filed an appeal to the division of inspection of the State Department of Public Safety from Commissioner Cellucci's revocation of the renovation permits. The State department on March 4, 1985, ordered Commissioner Cellucci to restore all the revoked renovation permits. By June, 1985, Kapsalis had applied for and received additional permits from the inspectional services department for work on the building.

The then executive director of the rent control board, Mr. Roger Mervis, by letter dated January 22, 1985 (the January 22, 1985, letter), to Kapsalis's then attorney, contended that Kapsalis's renovation permit applications (and the permits issued themselves) described work that exceeded that required by applicable State codes. Mr. Mervis asserted also that much of the proposed work would prevent reasonable residential occupancy, violating the removal permit ordinance (see appendix, *infra*) because Kapsalis lacked removal permits. Furthermore, Mr. Mervis warned that he would recommend that the board deny any application by Kapsalis for a "new construction" exemption (see St. 1976, c. 36, appendix, *infra* at point [Q]) that was based in part on the violation of the ordinance. He urged Kapsalis's then attorney and Kapsalis "to meet with our staff to resolve the issue of the scope of work at 991 Massachusetts Avenue in an amicable manner and to expedite the code-compliance process for this building."

In July, 1985, the general counsel of the rent control board visited the building and observed commercial activity being conducted in one unit. There was evidence that some of the then combined studio and larger apartments had no kitchen facilities.

During the following month, Kapsalis's then attorney, Mr. Peter Stanton, applied to the rent control board for an exemption from rent control, based on his assessment that the very substantial renovation work described by Kapsalis and the latter's architect "could possibly" qualify the rental units as "new construction." Mr. Stanton testified that, based on his observations, the work on the building was "substantially along" by August 2, 1985, the date of the application for a "new construction" exemption.

While this application for exemption was pending, the rent control board applied for this criminal complaint. That board voted on December 10, 1986, to deny the exemption.[3]

---

[3] Although there was evidence of commercial use of at least one unit prior to the issuance of the criminal complaint, the record does not contain clear evidence that any units were combined prior to that date.

### Discussion

We have been referred to no appellate decision reviewing a criminal (as distinguished from a civil) proceeding under the Cambridge rent control program. The burden resting upon the Commonwealth in this criminal case was appropriately brought to the attention of the trial judge by defense requests for required findings of not guilty, by requests for jury instructions, and at bench conferences at trial, where the scope and extent of the Commonwealth's obligations of proof ·were discussed in the light of cases like *Mullaney* v. *Wilbur*, 421 U.S. 684, 702-703 & n.31 (1975), and *Connolly* v. *Commonwealth*, 377 Mass. 527, 529-531 (1979). See *Commonwealth* v. *Pauley*, 368 Mass. 286, 292-299 (1975).

There have been arguments in this case about the effect of various provisions set out in the appendix to this opinion. For example, there has existed uncertainty concerning the extent of the power of the rent control board to require by regulation that a landlord, ordered by the city building authorities to remove violations of State sanitary and building codes, first obtain a removal permit from the rent control board. The testimony of Commissioner Cellucci and that of Mr. Roger Mervis differed significantly concerning the extent, if any, to which the rent control board had been given authority directly to limit (by the denial of a removal permit or otherwise) the extent of work done under a renovation permit.

In any event, during the period of time relevant in this case, Kapsalis and his counsel were confronted with conflicting official interpretations of pertinent regulatory provisions. He was being required by the city building officials to make costly renovations which would cure violations of State sanitary and building codes. At the same time he was being told in effect by the rent control board that he could not do more than the minimum renovation that would suffice to permit him to use his rent controlled premises for residential use. This would be at rental rates less than what he could receive if he made (when required in any event to incur significant expense) much more substantial improvements to the locus.

*Flynn* v. *Cambridge*, 383 Mass. 152, 156-161 (1981), established the general constitutional validity of the very similar successor of the Cambridge ordinance discussed in that case. We must determine, however, whether the rent control regulatory provisions have been properly interpreted and applied in the circumstances underlying the criminal conviction of Kapsalis. We thus discuss particular contentions made for Kapsalis.

1. It is argued for Kapsalis that St. 1976, c. 36, § 12(*c*), requires that a specific allegation in the criminal complaint be made that the violation was done "willfully." Here the original complaint made specific reference to a "VIOLATION CITY ORD. CH. 36, ACTS 1976, § 12c." Section 12(*c*) itself states that the offense must be committed "willfully." See appendix, *infra*, par. 1, quoting St. 1976, c. 36, § 12(*c*) at point [U].

On March 5, 1986, a District Court judge allowed a motion to amend by expressly alleging that the violation was done "willfully." The incorporation by reference of § 12(*c*) in the original complaint constituted a charge that the offense was wilful "with sufficient clarity to show a violation of law and to permit . . . [Kapsalis] to know the nature of the accusation against him." *Commonwealth* v. *Green*, 399 Mass. 565, 566 (1987). As the amendment was allowed some twenty days before the date set for the bench trial of Kapsalis, and several months before the 1987 jury trial, it could hardly have been prejudicial. We think there was no violation of Mass.R.Crim.P. 4(a) or 4(d). See the discussion in *Commonwealth* v. *Clark*, 393 Mass. 361, 363-364 (1984), and *Commonwealth* v. *Gonzalez*, 22 Mass. App. Ct. 274, 283-285 (1986). See also *Commonwealth* v. *Dunnington*, 390 Mass. 472, 476-477 (1983). The amendment was in a *practical* sense one of form and not of substance.

2. Kapsalis asserts that it was incumbent upon the rent control board, under St. 1985, c. 399, § 4, to make an election whether to proceed against Kapsalis by civil or by criminal proceedings. See appendix to this opinion, par. 1, discussing St. 1976, c. 36, § 11(*d*), at points [S] and [T]. The criminal prosecution, initiated on November 4, 1985, dealt with matters arising from much the same actions by Kapsalis as the civil contempt pro-

ceeding brought on February 19, 1986, against Kapsalis for violation of the injunction issued November 19, 1985 (see note 1, *supra*). Both proceedings related to the locus and its renovation. The question thus comes down to whether the 1985 statute was designed to require an "election" (in a strict interpretation of that word) by the rent control board between criminal and civil proceedings to compel compliance by Kapsalis with the purpose of the Cambridge rent control program.[4]

We conclude, taking into account the precise wording of § 4, that St. 1985, c. 399, § 4, was not intended inflexibly to require a true "election" between criminal and civil proceedings as mutually exclusive alternatives. Viewed as a whole, the 1985 statute seems to have been intended to strengthen the Cambridge rent control program and not to weaken it. See and compare *H.N. Gorin & Leeder Management Co.* v. *Rent Control Bd. of Cambridge*, 18 Mass. App. Ct. 272, 274-275 (1984). To some extent, also, the criminal complaint and the contempt proceeding could be viewed as directed to separate and sequential alleged violations of the regulatory provisions set out in the appendix, *infra*.

3. (a) Kapsalis makes general contentions about asserted conflicts between (1) the exception in subsection (2) of St. 1976, c. 36, § 3(*b*), defining "controlled rental units" as other than "rental units the construction of which was completed on or after January" 1969, and (2) § 48-02 of the rent control board's regulations. See appendix to this opinion at points [Q], [W], and [X]. It is also argued in behalf of Kapsalis that § 48-02, in some degree, is inconsistent with Ordinance No. 966, 1(b)(4)(iii) defining "removal from the market" as including rehabilitation, repair, or improvement of a controlled rental unit "other than as required by the laws of the Commonwealth or the city." See appendix, *infra*, at points [V] and [W].

---

[4] The record may not disclose the whole picture of why the rent control board decided to resort to criminal proceedings when both that board and Kapsalis were represented by counsel with very significant familiarity with the complexities of the Cambridge rent control program. As the trial judge essentially recognized (when sentencing Kapsalis), this seems a matter which all concerned might well have resolved without criminal proceedings.

(b) By these two contentions Kapsalis in substance asserts that c. 36, § 5(e), appendix, *infra*, at point [R], does not give the rent control board power to adopt a regulation requiring owners of rent controlled units to obtain a removal permit before they correct code violations under a renovation permit. For reasons stated below, we need not and do not decide (a) whether the rent control board has power to forbid work allowed to be done under a renovation permit granted by Commissioner Cellucci's office to the owner of rent controlled units, or (b) whether, if the owner wishes to spend more money than the minimum amount he must spend to satisfy the code provisions, he may do so, so long as he does not make any use of the altered premises without a removal permit from the rent control board, or (c) whether, if necessary work results in the creation of a substantially new unit, the owner (without first having applied for a removal permit) can qualify as having completed construction of a rental unit after January, 1969, within the exception to the definition in c. 36, § 3(b). See appendix at point [Q].

(c) It was said in *Southview Co-op. Housing Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 399 (1985), that the rent control "board's regulatory authority conferred by [c. 36] §§ 5(c) & (e) of the act is expressly limited only by the requirement that the board's regulations advance the purposes of the act." The validity of a filing fee regulation there was sustained "as . . . reasonably related to the purposes of the enabling legislation." Section 48-02 of the rent control regulations can be justified in similar fashion, at least as a reasonable method of enabling the rent control board to keep track of (and check upon) actions by owners of controlled units which may result in a diminution of the supply of controlled rental housing. Chapter 36, § 10(a) (quoted in the *Southview* case, 396 Mass. at 396 n.2), provides an exclusive method (not shown to be inadequate) of judicial review (on complaint of any person aggrieved) of any action, regulation, or order of the rent control board. This provision for judicial review supports the rent control board's power to prescribe § 48-02 of its regulations. The trial judge did not err in receiving it (or

other board regulations) in evidence. If inconsistencies exist between (a) the regulations and (b) the provisions of c. 36 or Ordinance No. 966, or if the rent control board has committed errors of law or has acted arbitrarily or capriciously, such matters can be dealt with in judicial review under c. 36, § 10(a).

(d) With the limited purpose which we treat as the justification of § 48-02 of the regulations, we see no such conflict involving that regulation as was considered in *Polednak* v. *Rent Control Bd. of Cambridge*, 397 Mass. 854, 859 et seq. (1986).

4. Chapter 36, § 12, under which this prosecution was brought, makes criminal a wilful violation of any regulation promulgated under the chapter. The conviction is to be affirmed if such a wilful violation of § 48-02 of the board's regulations is established. For the reasons already stated, § 48-02 was valid under c. 36, § 5(c), and admissible in evidence.

Mr. Mervis wrote to Mr. Stanton the January 22, 1985, letter (already mentioned, *supra*), with a copy sent to Kapsalis. This letter shows that Mr. Mervis brought to the attention of Kapsalis and his counsel the probable views of the rent control board that they would regard Kapsalis's action as raising a serious issue whether there was a violation of § 48-02 of the board's regulations. We think that it could be found by the jury that Kapsalis (after receipt of that letter) intentionally proceeded to remove from at least some of the newly combined rental units both kitchens in violation of the rent control board's explicit conditions set out in the conditional December, 1984, removal permit, *supra*, and in total disregard of the warnings in Mr. Mervis's letter. There was also evidence of commercial (and non-residential) use of combined units.

5. Kapsalis contends that the trial judge, in a case where a wilful violation of regulatory provisions is in issue, wrongfully charged on the effect upon that issue of advice of counsel. Kapsalis's initial request (no. 7) for instructions, based on language found in *Williamson* v. *United States*, 207 U.S. 425, 453 (1908), obviously took also into account the language of *Commonwealth* v. *Bradford*, 9 Met. 268, 272 (1845), and *Commonwealth* v. *Ballou*, 283 Mass. 304, 314 (1933). The trial

judge charged the jury in the language set out in the margin.[5] Defense counsel objected after the charge to this aspect of the instructions. Kapsalis's trial counsel asked the judge "to instruct . . . that a defendant . . . cannot be convicted of a crime which involves willfulness if he relied *in good faith* upon the advice of counsel even if the advice . . . [was] an inaccurate construction of the law."

The cases just cited indicate that an instruction on advice of counsel rests in large measure on the existence of "good faith" on the part of a defendant in relying upon the advice of counsel. See to similar effect *United States* v. *Poludniak,* 657 F.2d 948, 959 and n.9 (8th Cir. 1981). The evidence of the lawyer who advised Kapsalis, Mr. Stanton, concerning the advice he gave in fact (that the proposed work on the locus "could qualify possibly as a new constructed exempt building" under St. 1976, c. 36), was not incisive. There was no explicit evidence of reliance on Mr. Stanton's advice by Kapsalis after receiving Mr. Stanton's advice. Kapsalis did not take the stand. His purpose and intentions about what he had done and did was left to inferences (if not conjecture) drawn from his action. No more direct instructions about Kapsalis's reliance in good faith on Mr. Stanton's advice was required by the decisions.[6]

*Judgment affirmed.*

---

[5] The judge's instructions read in part:

"When one performs work on property, one does so at one's own risk in the event that one should run afoul of the law. When one relies upon the advice of another, one does so at his own risk. Nothing prevents a businessman from taking a chance. But there may be consequences . . . if he is proved to be wrong . . . . Again, the question of willfulness is for you to determine in this instance. Now the mere fact . . . that he received advice from a lawyer does not in and of itself necessarily constitute a defense. No man can willfully violate the law and excuse himself from the consequences of his conduct by pleading that he had followed the advice of his lawyer . . . ."

[6] Kapsalis does not appear now to argue that St. 1976, c. 36 (economic regulatory legislation), is unconstitutionally vague in the sense discussed in *Commonwealth* v. *John G. Grant & Sons, Co.,* 403 Mass. 151, 153-154 (1988).

APPENDIX.

APPENDIX CONTAINING CERTAIN PROVISIONS AFFECTING
RENT CONTROL IN CAMBRIDGE.

[All emphasis, other than that in the text of the
particular statute, ordinance, or regulation, should be
regarded as supplied. Capital letters have been set forth
in brackets in the text of the following material so as to
make possible convenient reference to the material
immediately following such bracketed letters respectively.]

1. *Statute 1976, c. 36,* is the principal statutory provision affecting Cambridge rent control. The chapter sets forth a preamble and a declaration of emergency (§ 1) neither of which need be reproduced here. Other pertinent provisions of c. 36 (with one 1985 amendment) read as set forth below.

---

[c. 36] SECTION 3. *Definitions.* The following words or phrases as used in this act shall have the following meanings:

a) "Rental units", any building, structure, or part thereof, or land appurtenant thereto, or any other real or personal property rented or offered for rent for living or dwelling purposes, including houses, apartments rooming or boardinghouse units, and other properties used for living or dwelling purposes, together with all services connected with the use or occupancy of such property.

b) "Controlled rental units", all rental units except: . . . .

2) [Q] *rental units the construction of which was completed on or after January . . . [1969],* or which are housing units created by conversion from a non-housing to a housing use on or after said date . . . .

[c. 36] SECTION 5. *Rent Board.*

a) This act shall be administered by a rent control board . . . .

e) [R] the board shall have the power to issue orders and promulgate regulations to effectuate the purposes of this act.

[c. 36] SECTION 11. *Civil Remedies.* . . .

d) [Added by St. 1985, c. 399, § 4] The board may [S] *elect* to enforce the provisions of this or any rule or regulation promulgated hereunder [T] *either* in a civil action for damages for declaratory *or* injunctive relief *or* under the provisions of section twelve.

[c. 36] SECTION 12. *Criminal Penalties.* . . .

c) whoever [U] *willfully* violates any provision of this act or any rule or regulation hereunder promulgated, or whoever knowingly makes any false statement in any testimony before the rent board or whoever

knowingly supplies the rent board with any false information shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than ninety days or both; provided, however, that in the case of a second or subsequent offense, such person shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than one year, or both. . . .

2. *Ordinance No. 966.* The pertinent Cambridge ordinance provisions, introduced in evidence, are found in c. 23 of the Cambridge city code as Ordinance No. 966, as amended.

Section 1 states a declaration of emergency in subsection (a) — and in subsection (b) proceeds to set forth various definitions of which one (par. 4) reads (in part):

. . . . (4) "Removal from the market" as applied to a controlled rental unit, includes but is not limited to: . . . .

(iii) rehabilitate, repair or improve [V], *other than as required by the laws of the Commonwealth or the city,* in such a way as to prevent residential occupancy during the course of the rehabilitation, repair or improvement. . . .

Section 1. Other provisions of Ordinance No. 966 read:

(c) *Removal regulated.* No owner . . . shall remove from the market any controlled rental unit, unless the [b]oard after a hearing grants a permit. The [b]oard may issue orders and promulgate regulations to effectuate the purposes of this section, and to prescribe the procedure for applications, notice, hearings, and the granting and withdrawal of permits. A permit to remove from the market a unit in a building converted or proposed to be converted to a condominium may be granted to the owner of the building before the sale of a unit. . . .

(f) *Penalty.* Any person who violates this section shall be punished by a fine of not more than five hundred dollars. The removal of each unit shall constitute a separate violation. Where, after a hearing, the board finds there are repeated and/or flagrant violations of this section, the [b]oard shall recommend to the Cambridge City Council or to the Cambridge Housing Authority that the public interest can best be served by taking the unit(s) by power of eminent domain in order to restore the unit(s) to service as housing for people with low and moderate incomes. . . .

3. *Regulations of the Cambridge Rent Control Board* received in evidence include the following:

48-01    No exemption from the Rent Control Act may be claimed or allowed if the exemption would result from act(s) which violate(s) any provision of the Rent Control Act, the Removal Permit Ordinance, or the Rent Control Board Regulations.

48-02 [W]    [Received in evidence subject to the objection of counsel for Kapsalis]

When a controlled rental unit is rehabilitated, repaired or improved (including but not limited to interior gutting of the unit) [X] *to such an extent that a new construction exemption may be claimed,* the unit is not exempt under Section 3(b)(2) of the Rent Control Act unless a removal permit pursuant to the Removal Permit Ordinance and Rent Control Board Regulations, was obtained prior to the rehabilitations, repair or improvement.

48-03    The combination of two or more controlled rental units by the elimination of bath or kitchen facilities, or by structural changes which prevent habitability as separate units, requires a removal permit(s) pursuant to the Removal Permit Ordinance and the Rent Control Board Regulations. Failure to obtain the necessary removal permit(s) constitutes a violation of the Removal Permit Ordinance. This regulation applies to non-condominium units occupied by the owner of the building in which they are located, as well as to all other controlled rental units . . . .

48-06    Conversion of a controlled rental unit from a housing to a non-housing use requires a removal permit pursuant to the Removal Permit Ordinance and the Rent Control Board Regulations. Failure to obtain the necessary removal permit(s) constitutes a violation of the Removal Permit Ordinance.