Black, P.J.
This is an appeal by the Brookline Rent Control Board from a judgment entered by the trial judge annulling its decision denying the plaintiffs a certificate of exemption from rent control for units 1 and 2 located , at 104 Babcock Street, Brookline.
*127 The appellate record discloses that the plaintiff, Roy N. McPherson, applied for a certificate of exemption from rent control with respect to units 1 and 2 located at 104 Babcock Street, Brookline. In support of his application, the plain tifff submitted a statement of facts which indicated that he had acquired the property from Congregation Klehillath Israel on April 25,1984, for the sum of $360,000. The building had been constructed in 1925 and, at the time of its purchase in 1984, it had fallen into such a state of disrepair that major repairs were required throughout the building. Records indicated that no repairs had been made since its initial construction. The heating system was defective in that the boiler was cracked, water pipes were broken and inoperable and little or no heat was available except on the first floor. The roof leaked, and because of water damage the second and third floors were badly rotted. The electrical wiring was inadequate, wiring was exposed and visible throughout the building. Numerous windows were missing and there were no storm windows. All plaster walls and ceilings were cracked and crumbling. Brickwork on the exterior of the building was cracked and crumbling. The new owner invested a total of $721,523.09 in repairs to the building (approximately $196,207.00 for each of the four units). A schedule was also attached to the plaintiffs statement reflecting precisely what work had been done to each of the units, the exterior of the building and its grounds.
A hearing on the defendant’s application was held on May 21, 1986, as a result of which the Board denied the application and made the following determinations of fact and law:
DETERMINATION OF FACT
1. 104 Babcock Street was constructed in 1925 as a two-family house.
2. The present owner, Roy McPherson, purchased 104 Babcock Street by a deed recorded May 4,1984.
3. At the time McPherson purchased the building no apparent alteration had been made to the original structure.
4. The first floor unit was occupied at the time McPherson purchased the property.
5. According to the affidavit of Edward Novakoff, the 2nd floor unit was occupied until approximately November, 1982, by Mr. Rudnick who at one time owned the property.
6. The tenants on the first floor moved out on or about March 1,1985.
7. On November 23, 1984, McPherson received an exemption from rent control (Docket #1117), based on his assertion that he lived in the 2nd floor unit.
8. Registration statements (IMR #173) for 104 Babcock Street were received by the Board on May 22,1985.
9. At the hearing on (IMR #173), McPherson testified that he moved out of 104 Babcock Street in December of 1984.
10. At the time McPherson purchased 104 Babcock Street, it had fallen into a state of extreme disrepair.
11. In June of 1984, the Bunker Construction Company was asked to conduct a general &urvey of 104 Babcock Street, with the understanding that McPherson wanted to set up a plan to correct perceived violations of the building and sanitary codes.
12. After the inspection, McPherson was informed by the Bunker Construction Company that the building was in a very hazardous state and that the occupants were in danger.
13. Despite the warning from the Bunker Co., 104 BabcockStreet continued to be occupied by McPherson until December of 1984 and by the tenants on the *128 first floor until March of 1985.
14. The Board of Appeals, on May 31, 1985, granted a request from McPherson to convert 104 Babcock Street from a 2-unit building into a 4-unit building in July of 1985.
15. Work began on the conversion from a 2-unit building into a 4-unit building in July of 1985.
16. On July 5,1985, McPherson applied for removal permits (Docket #846) in order to rehabilitate the existing units and market them as condominiums or rent them, the request for removal permits was denied by the Board on March 4,1986.
17. While the application for removal permits was pending before the Board the "units at 104 Babcock Street were kept empty and the conversion to a 4-unit building continued.
18. The renovations at 104 Babcock Street are close to the point of completion with only a few finishing touches to be applied.
19. All of the units at 104 Babcock Street are currently being kept off of the rental housing markets.
20. Prior ro the conversion to a 4-unit building 104 Babcock Street was registered with the .rent control Board as a two unit building, with unit one occupying the first floor and unit two occupying the second floor.
21. Prior to the conversion to a 4-unit building the third floor of 104 Babcock Street consisted of several rooms and two bathrooms, in addition the original heating system still in place serviced the third floor.
22. At the time of the registration (see finding #8), some confusion existed as to the status of the third floor on the registration statements filed by McPherson he stated that the third floor was part of unit 2.
23. At a hearing on IMR #173, McPherson testified that the third floor was a common area and not a part of the third floor unit.
24. In setting the rent control rents for the property, the Board did not-include the third floor as part of unit 2..
25. McPherson also testified at the hearing on IMR #173 that he moved out of 104 Babcock Street because he could not maintain heat on the second and third floors. - , , ,
26. The third floor at 104 Babcock Street was not a separate dwelling unit.
27. Unit 3 and 104 Babcock Street was created from a portion of the space on the third floor plus 500 square feet of space from the attic.
28. Unit 4 contained 2300 square feet of living space in the main living area; approximately 1250 square feet of this space was taken from unit 2.
29. Units 3 and 4 at 104 Babcock Street were completed after January 1, 1969; said units were constructed primarily from non-housing space.
30. The Board in this .instance finds that the value obtained from the addition of the new rental unit is greater than the loss incurred by the reduction of the size of unit 2 and that this loss can be further compensated by reducing the rent on Unit 2 to 60% of maximum rent in effect prior to the renovations.
31. Units 1 and 2 at 104 Babcock Street were created from the space that had originally been units 1 and 2 prior to the renovations.
32. There is ample evidence to conclude that prior to the renovations 104 Babcock Street was in a condition that would not have met the minimum standards of habitability.
33. There is also evidence to support the finding that Mr. McPherson did invest a great deal in the restoration of 104 Babcock Street to. habitable housing.
*129 34. The restoration of property that has fallen into less than habitable conditions is to be encouraged and the incentive for this type of restoration exist in that the Board may allow an appropriate increase in rents, including a 12-15% return on investment, where a property owner takes on the added expense of capital improvements.
35. Nothing in the definition of new construction in Section 3 (b) (2) suggests that this definition includes a property that has undergone restoration.
36. The restoration of 104 Babcock Street was necessitated by neglect the property suffered in the hands of its former owner.
37. This neglect indicates an obvious disregard of not only the rent control laws, but of existing building and sanitary codes.
38. To allow a property, which has fallen into disrepair, to be restored where such repairs should have been part of an on-going maintenance program, would encourage neglect of rental housing if the Board exempted such units from rent control after the restoration was completed.
39. The Board finds that any loss of housing units 104 Babcock Street was the result of a neglect that is the equivalent of a casualty loss.
40. The Board finds that any new construction that might have occurred to create new units 1 and 2 at 104 Babcock Street resulted from the illegal removal of units from the rental housing market despite the Board’s denial of a request for removal permits (see finding #16).
,41. The units 1 and 2 at 104 Babcock Street are not rental units the construction of which were completed after January 1,1969.
42. The units 1 and 2 at 104 Babcock Street are not rental-units created as a result of a conversion from a non-housing to a housing use.
43. 104 Babcock Street is now a 4 unit building.
44. Units 3 and 4 are not subject to rent control (see finding #29).
45. Units 3 and 4 are non-cont-rolled units in a building of 4 or more units and thus must comply with the requirements of Article XXXIX.
46. Neither Unit 3 or 4 has ever been occupied by tenants.
47. In light of Finding #46, the occupancy of either unit 3 or 4 by an owner of the unit as a condominium would not constitute a “removal from rental housing rule”, pursuant to Section 3 (h) (1) of Article 38 as incorporated in Article 39.
48. The sale of unit 3 or 4 as a condominium for owner occupancy is exempt from the conversion permit requirements of Article 39.
49. Units 1 and 2 at 104 Babcock Street are subject to rent control and, therefore, are subject to the removal permit provisions of Article 38.
DETERMINATION OF LAW
1. Pursuant to Section 3 (b) (2) of Article 38 of the By-Laws of the Town of Brookline does not exempt from rent control units restored after a fire, flood or other casualty.
2. The term “casualty” as used in Section 3 (b) (2) includes not only the cited examples, fire and flood but it includes the loss that would occur from letting property fall into such a state of disrepair as to render it uninhabitable.
3. Pursuant to Section 2 of Article 39 of the By-Laws of the Town of Brookline a conversion permit must be obtained before a landlord or other person may remove from rental housing use a non-controlled unit in a building of four or more residential housing units.
4. The phrase “remove from rental housing use” applies [for other applications see Section 3 (h) of Article 39] to the occupancy of a unit as a condominium unit, if the last previous occupant of the unit was a tenant, and *130 the phrase does not apply if the unit has never been occupied by a tenant, see Section 3 (h) (01) of Article 38.
Notwitstanding the fact that the official record is some 285 pages long, there appears to be comparatively little dispute as to the facts. The center of controversy involves the plaintiffs efforts to convert a neglected and essentially uninhabitable building into a four unit residential dwelling marketable outside the constraints of rent control. Succinctly stated, the plaintiffs rely on Article XXXVIII, Section 3 (b) (2) of the Town of Brookline Rent Control and Eviction By-Law which provides as follows: “Section 3.Definitions. The following words or phrases as used in this By-Law shall have the following meanings:
(b)Controlled rental units, all rental units except:
(1) rental units in hotels, motels, inns, tourist homes, rooming or board houses which are rented primarily to transient guests for a period of less than fourteen consecutive days;
(2) rental units the construction of which was completed on or after January one, nineteen hundred and sixty-nine, or which are housing units created by conversion from a nonhousing to a housing use on or after said date; provided that, any rental units restored after fire, flood or other casualty shall not be exempt under this subsection.”
By its terms, the By-Law expressly exempts rental units “constructed” after January 1,1969. While a deliberate course of conduct adopted by an owner pursuant to which a rental unit is allowed to fall into such disrepair that its restoration to rental status would, in essence, amount to total reconstruction of the structure, may be actionable conduct by the Board of Health, the Rent Control Board, or other Town agencies, it is not an operative condition which renders inapplicable Section 3 (b) (2) of the By-Law. Therefore, the Board was in error when it ruled that units removed from housing use by wear, tear and neglect are illegally removed, and may not be the subject of the 3 (b) (2) exemption. Where, as here, a new owner undertakes to rehabilitate a badly run-down, uninhabitable building, and the repairs needed to renovate the structure are so extensive as to be tantamount to new construction, the exemption clearly applies. In this case, for example, the cost of the repairs to the entire building ($721,523.09), were more than twice its purchase price ($360,000). Parenthetically, we might add that such a conclusion would not appear to be inconsistent with the overall purpose and intent of the By-Law, inasmuch as needed housing units are restored to the market place, albeit outside the scope of rent control.
The Board, however, further contends that the exemption is inapplicable because of the provision contained in Section 3 (b) (2) which states that “any rental units restored after fire, flood, of other casualty shall not be exempt under this subsection” (underlining supplied). The Board determined that the term “casualty” as used in Section 3 (b) (2) includes a loss that occurs from the owner’s letting property fall into such a state of disrepair as to render it uninhabitable.
We note that the term “casualty” is used in many contexts, including insurance, taxation, contracts, worker’s compensation, and various other branches of the law. In all its usages, however, it connotes unintended occurrences arising at a definable time, as distinguished from the outcome of a long-standing process of wear, tear and neglect. Scores of authorities emphasize the accidental, unexpected, unanticipated nature of a “casualty” (see Black’s Law Dictionary “5th ed. 1979”, Page 198). Obviously, language which is clear and unambiguous must be given its ordinary meaning *131 (Bronstein v. Presidential Ins. Co. of America, 390 Mass. 701, 704 (1984) ). Had the Town of Brookline intended to redefine the term “casualty” in its By-Law, or expressly broaden the language of the provision limiting Section 3 (b) (2) exemptions, it could have done so.[2]
In conclusion, the trial judge was correct in annulling the Board’s decision denying the Certificate of Exemption. Consequently, it ordered that the Board forthwith issue the Certificate of Exemption, as applied for, subject of course to any further appellate review.

Concurring Opinion

 It is noted that the Cambridge Rent Control By-Law contains a provision similar to that contained in Sec. 9A (a) of the Brookline By-Law authorizing the Board to promulgate rules and regulations regarding the removal of any controlled rental unit from rental housing use. The Cambridge Board has adopted a regulation which specifically provides that “[w]hen a controlled rental unit is rehabilitated, repaired or improved (including but not limited to interior gutting of the unit) to such an extent that a new construction exemption may be claimed, the unit is not exempt under Section 3 (b) (2) of the Rent Control Act unless a removal permit pursuant to the Removal Permit Ordinance and Rent Control Board Regulations, was obtained prior to the rehabilitations, repair or improvement.” (Underlining supplied.) (See also Commonwealth v. Kapsalis, 26 Mass. App. Ct. 448, 461 (1988).
Additionally, this appeal has been presented as an issue of the applicability and scope of the Section 3 (b) (2) new construction exemption. Since the trial judge’s report does not address the matter of the role of a removal permit under Section 9A, we express no opinion as to the interrelation between Sections 9A and Section 3 (b) (2) at this time. Our review is confined to matters contained in the trial judge’s report. Lowell Window Shade Co. v. Bernstein, 57 Mass. App. Dec. 179 (1976).