**Howard H. GILBERT, Jr., et al.,**
**Plaintiffs, Appellants,**

v.

**CITY OF CAMBRIDGE, et al.,**
**Defendants, Appellees.**

**No. 90–1907.**

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1991.

Decided May 3, 1991.

James D. St. Clair, with whom Hale and Dorr, Kenneth R. Berman, and Sherin and Lodgen, Boston, were on brief for plaintiffs, appellants.

Stephen B. Deutsch, with whom Andrew Z. Schwartz and Foley, Hoag & Eliot, Boston, were on brief for defendants, appellees.

Before CAMPBELL and SELYA, Circuit Judges, and BOWNES, Senior Circuit Judge.

SELYA, Circuit Judge.

Attempting by heroic efforts to sail through straits left windless by recent Supreme Court precedent,[1] certain property owners asked the United States District Court for the District of Massachusetts to overturn, on constitutional grounds, a rent control ordinance adopted in 1979 by the City of Cambridge (the Ordinance).[2] The district court did not allow the voyage to proceed. *Gilbert v. Cambridge*, 745 F.Supp. 42 (D.Mass.1990). The property owners appeal. We affirm.

## I. BACKGROUND

In reviewing a dismissal under Fed.R. Civ.P. 12(b)(6), we treat all well-pleaded factual averments as true and draw all reasonable inferences therefrom in the appellants' favor. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989); *Ochoa Realty Corp. v. Faria*, 815 F.2d 812, 813 (1st Cir.1987). Thus, our focus is on what was alleged in, or could be proved in connection with, the complaint as framed.

### A. *The Ordinance.*

Although Cambridge has experienced some form of rent control for over two decades, there have been changes and revisions in the particulars of the system. The City's present scheme was enacted in 1976, pursuant to powers granted under Chapter 36 of the Massachusetts Acts of 1976 (the Act). About three years later, the city council passed the Ordinance, thereby enlarging the 1976 law. Aware that a trend toward condominium conversion had been depleting scarce housing stock and exacerbating an already existing shortage of rental housing, the council opted to restrict the ready removal of residential units from the rental market. As stated in the Ordinance's preface:

> A serious public emergency continues to exist in the City with respect to the housing of a substantial number of its citizens.... The emergency has worsened since 1976 because of the removal of a substantial number of rental units from the market, by condominium conversion, demolition, and other causes. As a result, more than two thousand or over ten percent of the controlled rental units in

1. *See, e.g., Pennell v. San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

2. The Ordinance effectively imposed a series of restrictions on the conversion of rental units to condominiums and cooperatives. The removal restrictions, which were originally codified as Ordinance 926 and subsequently recodified, with amendments, as Ordinance 966, have recently been blended into Chapter 8.44 of the Code of the City of Cambridge (1990). All references to the Ordinance will be the latest codification.

the city have been removed from the housing market since 1970, and the vacancy rate has fallen below one percent. In order to carry out the purposes of the Act, and to continue to provide a sufficient supply of decent, affordable rental housing accommodations especially for families of low and moderate income and for elderly people on fixed incomes, it is necessary ... to regulate the removal of controlled rental units from the market.

Cambridge City Code § 8.44.010.

The Ordinance applies to all housing units offered for rent prior to August 13, 1979. It prohibits an owner from "removing" any such unit from the rental market without first obtaining a permit from the Rent Control Board (the Board). As defined by the Ordinance, "removal from the market" includes, *inter alia*, the conversion of a "controlled rental unit" into a cooperative or a condominium. Cambridge City Code § 8.44.020(D).[3] The Ordinance establishes three overlapping criteria which the Board is to consider in deciding whether or not to grant a removal permit: (1) the effect of withdrawal in terms of the benefits to persons within the class which the rent control scheme sought to protect; (2) the hardships imposed on tenants of the affected units (and any mitigating provisions stipulated by the permit-seeker); and (3) any aggravation of the rental housing shortage (especially for the elderly, families of low-to-moderate income, and people on fixed incomes) that might result from the proposed change of use. *Id.* at § 8.44.050. The Ordinance imposes fines for withdrawing controlled rental units from the rental market in derogation of the permit process and, if violations become flagrant, authorizes the City to take the offending unit by eminent domain. *Id.* at § 8.44.090.

Applicable state law also contains criminal penalties for the willful withdrawal of a housing unit from the rental market without a removal permit, Act § 12(c); *see generally Commonwealth v. Kapsalis*, 26

Mass.App.Ct. 448, 450, 529 N.E.2d 148, *rev. denied*, 403 Mass. 1105, 531 N.E.2d 1274 (1988), and provides for judicial review of decisions to grant or deny removal permits. Act § 10. Withal, landlords retain a statutory entitlement to derive a "fair net operating income" from their controlled rental units. Act § 7(a).

### B. *The Plaintiffs.*

There are, in essence, two groups of appellants: the Southview plaintiffs and the Blevins plaintiffs.

1. *The Southview Plaintiffs.* This group comprises Southview Cooperative Housing Corporation (SCHC), the record owner of a residential building consisting of about 100 rental units, and eleven SCHC shareholders. In 1979, shortly before the Ordinance was adopted, the Southview plaintiffs took preliminary steps toward converting their building to a condominium. The Ordinance became effective before any sales were consummated, thereby subjecting the units to the permit process. In January 1980, Southview residents applied for forty-three removal permits. After holding a hearing, the Board denied the applications in April of that year.

Eschewing judicial review of the Board's decision, the owners proceeded to form SCHC and to convert the building into a cooperative. They intended to market the individual residences not as rental units, but as cooperative apartments, on the theory that the Ordinance did not subject cooperatives to the permit requirements. This plan was soon stymied when the Board adopted an interpretive regulation declaring cooperative conversions to be covered by the Ordinance. An attempt to have the state courts rule that the Ordinance did not apply to cooperatives was unsuccessful. *Southview Co-operative Housing Corp. v. Rent Control Board*, 16 Mass.App.Ct. 1102 (1983). The City subsequently amended the Ordinance to prohibit in, *haec verba*, the conversion of rental units to coopera-

---

**3.** No permit is needed for the conversion of a rental unit if it is to be occupied by an owner who is the current tenant, who has continuously occupied the unit as a tenant since before August 10, 1979, and who intends in good faith to occupy it indefinitely in the future. *See* Cambridge City Code § 8.44.020(D)(1).

tive ownership without first obtaining removal permits.

In November 1980, the Southview plaintiffs again applied for permits, this time seeking to withdraw forty-seven rental units from the housing market. After a hearing, the Board again demurred. The plaintiffs did not pursue judicial review of the Board's action.

2. *The Blevins Plaintiffs.* This group comprises two trusts which together own four apartments buildings in Cambridge, aggregating more than 170 rental units.[4] In 1981, Charles Blevins formed a pair of condominium associations, intending to convert two of the properties into condominium aggregates and market the units. The Ordinance required that Blevins obtain permits to implement this plan. He never tried to do so—the trustees allege that such an attempt would have been futile—and the conversion plan was shelved.[5]

## II. PROCEEDINGS BELOW

The plaintiffs brought this suit on May 27, 1988. Invoking 42 U.S.C. § 1983, they sought to have the Ordinance declared unconstitutional, both on its face and as applied. In the plaintiffs' view, the Ordinance constituted an impermissible taking of property without due process or just compensation (count 1) and a violation of the Equal Protection Clause (count 2). The plaintiffs also charged that the Ordinance abridged rights secured by the state constitution and claimed, in count 3, that the Board had omitted certain studies required under Cambridge City Code § 8.44.030 anent the number of available rental units. The defendants moved to dismiss for failure to state an actionable claim. Following oral argument and plethoric briefing, the district court granted the motion in its entirety. *Gilbert*, 745 F.Supp. 42.

The court held in substance that all claims of facial invalidity, together with the

as-applied claims of the Southview plaintiffs, were barred by the expiration of a three-year limitation period. *Id.* at 45–49. The as-applied claims of the Blevins plaintiffs were dismissed as unripe. *Id.* at 49–50. As an alternative basis for dismissal, the court wrote that it would in any event decline to hear the case in its present posture because it viewed a federal declaratory judgment action as an inappropriate vehicle for resolving claims asserted under the Takings Clause of the federal Constitution. *Id.* at 50–56. In part, the court reasoned that no constitutional violation could be demonstrated unless and until the plaintiffs had utilized the inverse condemnation procedure described in Mass.Gen.L. ch. 79, § 10, and had been denied just compensation. *Gilbert*, 745 F.Supp. at 52. Finally, the court ruled that the plaintiffs had not made out a cognizable due process claim, *id.* at 51 n. 7; that count 2 of the complaint failed to state a claim upon which relief could be granted, *id.* at 51 n. 8; and that pendent jurisdiction was lacking in respect to the various state-law claims, *id.* at 56 n. 15.

## III. THE "TAKINGS" CLAIMS

We begin by examining the plaintiffs' claims under the Takings Clause, treating the facial and as-applied challenges separately.

### A. *The Facial Challenges.*

■ The facial challenges of the two groups of plaintiffs rest on a common foundation. In seeking a declaratory judgment that the Ordinance is unconstitutional on its face, both sets of plaintiffs must cross the threshold requirement imposed by Article III, Section 2, of the federal Constitution and show that an "actual controversy"

---

**4.** We have no need to differentiate between the trusts. When this suit began, Charles Blevins was the trustee of both trusts. After Blevins' death, the successor trustees, Benjamin Butcher, Donald B. Zinn, and Jonathan Keyes, were duly substituted as plaintiffs pursuant to Fed.R.Civ.P. 25(a). For the sake of clarity and to facilitate reference, we shall refer to these plaintiffs as

"the Blevins plaintiffs," "the trustees," or simply "Blevins."

**5.** On July 24, 1981, Peter Mullane, one of Blevins' tenants, did apply for a removal permit to purchase and reside in a different apartment in the same building. The permit was granted. Mullane never exercised it.

exists.[6] *Steffel v. Thompson*, 415 U.S. 452, 458, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). To do so, the plaintiffs must demonstrate that the "mere enactment" of the Ordinance constituted a taking without just compensation in violation of the fifth amendment. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981); *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).[7] In this situation, the plaintiffs cannot cross the jurisdictional threshold.

The Court has set forth a "fairly straightforward" test to be used in considering facial challenges of this genre: "A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land....' " *Hodel,* 452 U.S. at 295–96, 101 S.Ct. at 2370 (quoting *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141). Applying this test to the Surface Mining Act, the Court held that its "mere enactment" could not constitute a taking because the statute (1) did not categorically prohibit surface coal mining, but provided for administrative relief in the form of variances or waivers from the statutory use restrictions, and (2) allowed property owners freedom to dedicate their coal-bearing lands to alternative uses. *Id.* at 296–97, 101 S.Ct. at 2370.

In *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Court refined the way in which this test relates to land use regulations containing provisions for administrative relief:

A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*Id.* at 127, 106 S.Ct. at 459.

This jurisprudence could not be more directly on point, defenestrating appellants' claim that passage of the permit requirement, without more, itself infracted their constitutional rights. The Ordinance does not presume to prohibit landlords, categorically, from putting their property to the uses to which appellants aspire (e.g., condominium conversions). To the exact contrary, the Ordinance makes available a procedure that enables landlords wishing to convert buildings from clusters of rental units to condominiums or cooperatives, to do so upon application for, and receipt of, municipal approvals. Given the availability of such a permit system and the promise implied thereby—that landlords may be granted leave to use their property as they wish—the mere enactment of the Ordinance cannot constitute a taking in the fifth amendment sense. *Accord, e.g., Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 187–90, 105 S.Ct. 3108, 3117–18, 87 L.Ed.2d 126 (1985); *Southern Pacific Transp. Co. v. Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990); *Littlefield v. Afton,* 785 F.2d 596, 609 (8th Cir.1986).

What is more, even if the permit process were, as appellants contend, an illusion, the Ordinance, on its face, preserves an economically viable property use to landlords; after all, the enabling legislation upon which the Ordinance depends explicitly provides that property owners retain an en-

---

**6.** This requirement has been expressly incorporated into the Federal Declaratory Judgment Act, which provides in pertinent part:

In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.
28 U.S.C. § 2201.

**7.** The fifth amendment is, of course, made binding upon state actors by means of the fourteenth amendment. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141; *Fuentes v. Shevin,* 407 U.S. 67, 84–86, 92 S.Ct. 1983, 1996–97, 32 L.Ed.2d 556 (1972).

titlement to receive a "fair net operating income" on all their rent-controlled units. Act § 7(a). We view this assurance as adequate on its face to meet the second part of the Court's test. *See Riverside,* 474 U.S. at 127, 106 S.Ct. at 459 (quoted *supra* p. 56); *see also United States v. Locke,* 471 U.S. 84, 107, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985) ("Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed."). Thus, under the applicable caselaw, the Ordinance is safe from a facial challenge because an economically viable use of the property is preserved.

For these reasons, appellants' facial challenges to the Ordinance presented no justiciable controversy. Therefore, those challenges were properly dismissed as unripe.[8]

### B. *The As–Applied Challenge—Southview.*

It is apodictic that, where a state law or municipal ordinance contains provisions for administrative relief, an as-applied claim can only arise when a property owner has actually sought, and been denied, a permit. *See, e.g., Pennell v. San Jose,* 485 U.S. 1, 10, 108 S.Ct. 849, 856, 99 L.Ed.2d 1 (1988); *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 348–53, 106 S.Ct. 2561, 2565–68, 91 L.Ed.2d 285 (1986); *Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013, 1026 (1st Cir.1989). It is only at this point that one's property is meaningfully burdened by the law, bringing an actual controversy between the owner and the government into being. Thus, the disparate situations of the plaintiff groups—the Southview plaintiffs applied for, and were denied, removal permits in 1980, while the Blevins plaintiffs never sought permits—provoke different analytic concerns. Hence, we consider the two groups' as-applied claims separately. We begin with Southview.

The limitation period applicable to a section 1983 claim is to be found in the general personal injury statute of the jurisdiction in which the claim arises. *See Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 581–82, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia,* 471 U.S. 261, 276–79, 105 S.Ct. 1938, 1947–49, 85 L.Ed.2d 254 (1985); *Altair Corp. v. Pesquera de Busquets,* 769 F.2d 30, 31 (1st Cir.1985). In Massachusetts, Mass.Gen.L. ch. 260, § 2A fixes a three-year limitation for the commencement of tort actions and, consequently, applies to section 1983 suits. *See Doty v. Sewall,* 784 F.2d 1, 11 (1st Cir.1986). The limitation period begins to run upon the invasion of the plaintiffs' interests. *See Altair,* 769 F.2d at 32; *Kadar Corp. v. Milbury,* 549 F.2d 230, 234–35 (1st Cir. 1977); *cf. Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (in discrimination case, statute of limitations begins to run when illegal act takes place, not when "the consequences of the act become painful"). A straightforward application of the rule dictates, then, that the time for bringing suit on the Southview plaintiffs' as-applied claims expired in 1983 (on the third anniversary of the denial of their permit applications). The Southview plaintiffs seek to avoid this temporal bar in three ways.

1. *Nature of Relief Sought.* First, the Southview plaintiffs contend that the statute of limitations is inapplicable to an action cast in the declaratory judgment mold. The argument is meritless. To prevent plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labelling—styling an action as one for declaratory relief rather than for damages—courts must necessarily focus upon the substance of an asserted claim as opposed to its form. It is settled, therefore, that where legal and equitable claims coexist, equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy.[46]

---

**8.** The district court also rested its dismissal of these claims, in part, on the existence of a perceived time bar. *Gilbert,* 745 F.Supp. at 45–

**46.** We consider this ruling problematic. In any event, we need not reach the question and prefer to leave its resolution to another day.

See Cope v. Anderson, 331 U.S. 461, 464, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602 (1947); Russell v. Todd, 309 U.S. 280, 289, 60 S.Ct. 527, 532, 84 L.Ed. 754 (1940).

Given this precedential guidance, we agree entirely with the Second Circuit that if "a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period of time will govern." Orangetown v. Gorsuch, 718 F.2d 29, 42 (2d Cir.1983), cert. denied, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984); cf. Golemis v. Kirby, 632 F.Supp. 159, 164 (D.R.I.1985). Moreover, we see no reason why this rule should apply with less force to declaratory judgment actions in the civil rights field than to other, less volatile areas of the law. See, e.g., Clulow v. Oklahoma, 700 F.2d 1291, 1302 (10th Cir.1983) ("civil rights claims are assertable as legal rights, enforceable in actions at law as well as in equity; hence equity's jurisdiction is concurrent, not exclusive"); Swan v. Board of Higher Educ., 319 F.2d 56, 59–60 (2d Cir.1963) (section 1983 action seeking declaratory relief barred by statute of limitations).

■ 2. Anticipating One's Defenses. The Southview plaintiffs next claim that, as they are still under the lash of the Ordinance, it makes no sense to deny them declaratory relief since, in any future enforcement action, they would promptly raise the constitutionality of the Ordinance as a defense. We find this idea, albeit precocious, to be equally unavailing. The temporal bar cannot be sidestepped merely by asserting that the appellants' declaratory judgment suit was brought to establish defenses against the rainy day, in the future, when the Ordinance might be enforced against them. Cf., e.g., Natural Resources Defense Council, Inc. v. United States EPA, 790 F.2d 289, 315 (3d Cir. 1986), cert. denied, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987) (party's demand for a promise of exemption from waste water regulations on the basis of an as-yet-hypothetical situation held to be premature). Such a smoke-and-mirrors approach would place far too much priority on theoretical possibilities at the expense of practical actualities, requiring us, in the last analysis, to treat aggressor as defender, petitioner as respondent. In effect, it would also serve to make justiciable claims which were simultaneously stale (i.e., time-barred as to the actual permit denial) and unripe (i.e., not yet mature as to any potential enforcement action). The decided cases are to the contrary. See Mobil Oil Corp. v. Department of Energy, 728 F.2d 1477, 1488 (Temp.Emerg.Ct.App.1983) (holding that laches can be invoked against a declaratory judgment plaintiff who seeks affirmatively to challenge an agency rule to which it remains subject), cert. denied, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984); see also Peter Henderson Oil Co. v. Port Arthur, 806 F.2d 1273, 1275 (5th Cir.1987) (holding that statute of limitations barred plaintiff's § 1983 suit seeking declaration that municipal drilling ordinance was unconstitutional).

We refuse to subvert the realties of the case before us simply to suit a party's convenience. The Southview plaintiffs are, indeed, plaintiffs. They have been barred from bringing a claim for damages since three years after the denial of their permit applications. Draping their claim in the raiment of the Declaratory Judgment Act, some five years after the window of opportunity framed by the statute of limitations has closed, cannot elude this time bar.

■ 3. Continuing Violation Theory. Finally, the Southview plaintiffs attempt to invoke tolling on the theory that the Board's denial of permits constituted a "continuing violation" of their constitutional rights. This approach, too, leads down a blind alley. As we have said in the Title VII context, "courts must be careful to differentiate between discriminatory acts and the ongoing injuries which are the natural, if bitter, fruit of such acts." Jensen v. Frank, 912 F.2d 517, 523 (1st Cir.1990); see also Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 182 (1st Cir.1989).

On the facts of this case, the Southview plaintiffs' argument obfuscates what we have termed the "critical distinction" between a continuing act and a singular act

that brings continuing consequences in its roiled wake. *Altair*, 769 F.2d at 32. The single act challenged—the Board's denial of the Southview plaintiffs' permit applications—comprised a discrete event. It occurred in 1980. The statute of limitations ran uninterrupted after that denial took place. "In a § 1983 case concerning the unlawful taking of property, the statute of limitations begins to run on the date of the wrongful appropriation." *Id.* It is altogether beside any relevant point that the Southview plaintiffs continued to feel the effects of the Board's adverse decision in 1983 (when the limitation period expired) and beyond. *See Jensen*, 912 F.2d at 523. Whatever harms were suffered add up to nothing more than the predictable, albeit painful, consequences of the permit denial. Absent any showing of the kind of ongoing acts needed to foster tolling, the Southview plaintiffs cannot belatedly resurrect their as-applied claims.[9]

C. *The As–Applied Challenge—Blevins.*

Having never sought removal permits, the Blevins plaintiffs occupy an even more vulnerable position. They must overcome the strong presumption that their as-applied claims are not ripe for judicial resolution. *See, e.g., Pennell*, 485 U.S. at 10, 108 S.Ct. at 856; *County of Yolo*, 477 U.S. at 348–53, 106 S.Ct. at 2565–68; *Hodel*, 452 U.S. at 296–97, 101 S.Ct. at 2370–71; *Tenoco*, 876 F.2d at 1026–27. Recognizing the formidable obstacle posed by the ripeness requirement, the Blevins plaintiffs attempt to evade it in two ways. We consider each stratagem.

■ 1. *The Loretto Doctrine.* Appellants first assert that submitting to the permit process is not essential because the Ordinance effects a permanent physical occupation of their property, which is *per se* unconstitutional and cannot be saved from invalidity by a permit system. This asseveration invokes the specter of *Loretto v. Teleprompter Manhattan CATV Corp.*,

458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Loretto*, the Court held that, since any "permanent physical occupation," however small, effectively destroys an owner's rights to possess, use, and dispose of the property in question, the fact of the occupation is itself sufficient to show that there has been a "taking" for which compensation is due. *Id.* at 432–38, 102 S.Ct. at 3174–77. Under *Loretto*, appellants tell us, resort to the permit process here is unnecessary to establish a taking in the constitutional sense.

This argument overlooks, however, that there has been no permanent physical occupation of the kind envisioned in *Loretto*. *See id.* at 437, 102 S.Ct. at 3177 (describing "permanent physical occupation" as "[t]he placement of a fixed structure on land or real property"). The argument likewise overlooks the *Loretto* Court's warning that its ruling was "very narrow" and not intended to "question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property." *Id.* at 441, 102 S.Ct. at 3179. The *Loretto* Court was explicit in stating that its holding was not to be employed to challenge settled doctrine anent regulation of rental housing:

> [W]e do not agree ... that application of the physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships. This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.

*Id.* at 440, 102 S.Ct. at 3178. Hence, *Loretto* by its own terms dispels any notion that a regulation like the Ordinance creates the sort of "permanent physical occupation" which might allow a suit to redress an allegedly unconstitutional taking without

---

9. Appellants' reliance on *Gordon v. Warren*, 579 F.2d 386 (6th Cir.1978), is mislaid. *Gordon* stands for the unremarkable—and entirely dissimilar—proposition that, when a law is declared unconstitutional, the limitation period for a takings claim begins to run from the date of the statute's invalidation. *Id.* at 391. The case at hand is, obviously, cut from a different bolt of cloth.

regard to the availability of a facially satisfactory permit process.[10]

**2. *The Futility Exception.*** This brings us to the trustees' second contention. Citing *Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 461 (1st Cir.1988), where we stated in an unrelated context that "[t]he law should not be construed idly to require parties to perform futile acts or to engage in empty rituals," the trustees contend that they should be excused from the permit process since participating in it would be an exercise in futility. Whatever the theoretical possibility that the Board might grant removal permits, the trustees say, such permits are virtually never granted, "especially in connection with any effort to occupy cooperative or condominium units or sell such units to persons who desire to occupy them." In support of this otherwise conclusory averment, the trustees mention the 1980 Southview denials, and argue that, since they "are functionally in the same position as Southview, except that they have more units," one can infer that the same result would follow. As additional evidence, they cite an affidavit, filed as part of their opposition to defendants' motion to dismiss, where it was stated, on the basis of a review of the Board's records, but without any indication as to the number of such applications previously filed, that no removal permit application "had [ever] been granted to allow a conventional conversion from apartment use to a condominium or cooperative, or to allow a unit owner or proposed unit owner to move into his or her own unit if it were already occupied by an existing tenant." An affidavit submitted by the defendants on the same issue, after an arguably more cursory review of the same records, reveals that "there has been only one (1) application to the Board for removal permits to allow the sale of the units in a rental building as condominiums since January 1, 1982." [11]

Other courts have recognized that there is a narrow "futility exception" to the final decision requirement for takings claims which, on rare occasion, may excuse the submission of an application for a variance or other administrative relief. *See, e.g., Southern Pacific*, 922 F.2d at 504; *Eide v. Sarasota County*, 908 F.2d 716, 726–27 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). We agree that there are circumstances in

---

**10.** To be sure, we do not suggest that all regulation of rental housing is outside the sweep of *Loretto.* Indeed, the *Loretto* Court itself hypothesized that the physical occupation rule might apply were "the government to requisition a certain number of apartments as permanent government offices," *Loretto,* 458 U.S. at 439 n. 17, 102 S.Ct. at 3178 n. 17. It seems patent to us, however, that an action which actually changes control over, as well as occupation and use of, the property, arguably within *Loretto,* is something very different from a regulation that restricts the conversion of rental apartments into condominiums or cooperatives, but which allows their owners to seek variances and, if variances are denied, to continue either to rent the units and receive a fair net operating income therefrom or to occupy the units.

**11.** These affidavits were filed with the district court several months before the motion to dismiss was heard. They were referred to by at least one side during oral argument on the motion. Yet, the district court made no reference to the affidavits and appears not to have converted the motion into one for summary judgment as allowed under Fed.R.Civ.P. 12(b) ("matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"). We need neither consider the effect, if any, of these affidavits, nor choose among the differing approaches to Rule 12(b). *Compare, e.g., Grand Union Co. v. Cord Meyer Development Corp.,* 735 F.2d 714, 716–17 (2d Cir.1984) (holding that presence of affidavits automatically converts motion to dismiss to motion for summary judgment unless affidavits were explicitly "excluded from consideration" by the district court) *with, e.g., North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 582 (9th Cir.1983) (holding that district court properly treated motion as motion to dismiss, despite presence of affidavits, where there was no indication of the court's reliance on outside materials and the court expressly stated that it was dismissing for failure to state a claim upon which relief could be granted); *see also Jacob v. Curt,* 898 F.2d 838, 839 (1st Cir. 1990) (rejecting contention that court had improperly treated motion to dismiss as motion for summary judgment where no indication of court's reliance on affidavit was made manifest). In this case, whether or not the affidavits were considered makes no difference; they are so inconclusive that, whichever approach to Rule 12(b) we might ultimately favor, the result on appeal would be unaffected.

which a party, on grounds of futility, might bypass a permit process and go directly to court seeking judicial review of a law's constitutionality under the Takings Clause. Futility may be found, for example, where special circumstances exist such that a permit application is not a "viable option," *Herrington v. Sonoma*, 857 F.2d 567, 570 & n. 2 (9th Cir.1988), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989), or where the granting authority has dug in its heels and made it transparently clear that the permit, application or no, will not be forthcoming, *e.g.*, *Parkview Corp. v. Department of Army, Corps of Engineers, Etc.*, 490 F.Supp. 1278, 1282 (E.D. Wis.1980). In our judgment, recognizing a stringently cabined futility exception is consistent with familiar doctrine suggesting that exhaustion of administrative remedies will not ordinarily be required where the hierarchs have made it quite plain that the relief in question will be denied, *see City Bank Farmers Trust Co. v. Schnader*, 291 U.S. 24, 34, 54 S.Ct. 259, 263, 78 L.Ed. 628 (1934); *White Mountain Apache Tribe v. Hodel*, 840 F.2d 675, 677 (9th Cir. 1988) ("administrative review may be futile by virtue of a preannounced decision by the final administrative decision-maker"), or where a party has been denied access to administrative remedies, *see, e.g., Christopher W. v. Portsmouth School Comm.*, 877 F.2d 1089, 1096–97 (1st Cir.1989), or where there is "objective and undisputed evidence of administrative bias," *see, e.g., White Mountain Apache Tribe*, 840 F.2d at 677–78.

The futility exception is far easier to conceptualize than to define. Since obtaining a final municipal decision should be the rule, however, the burden of establishing futility must lie with the party seeking to bypass the permit procedure—and any reasonable doubt ought to be resolved against

that party. Thus, although futility can excuse a plaintiff's eschewal of a permit application, the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. *See United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 273, 51 S.Ct. 376, 378, 75 L.Ed. 1025 (1931); *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 106 (D.C.Cir. 1986). To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).[12] *See James v. United States Dept. of HHS*, 824 F.2d 1132, 1138–39 (D.C.Cir.1987) (administrative remedy futile where certainty of adverse decision exists); *Randolph–Sheppard*, 795 F.2d at 105 (similar); *see also Southern Pacific*, 922 F.2d at 504 (futility exception inapplicable unless manner of rejection of earlier application "makes it clear that no project will be approved").

Recognizing the difficulty of formulating precise guidelines for this exception, the Ninth Circuit, relying on *County of Yolo*, 477 U.S. at 352–53 n. 8, 106 S.Ct. at 2568 n. 8, has held that, at a bare minimum, "[a] property owner cannot rely on the futility exception until he or she makes at least one meaningful application" for administrative relief. *Herrington*, 857 F.2d at 569; *Kinzli v. Santa Cruz*, 818 F.2d 1449, 1454–55 (9th Cir.), *amended*, 830 F.2d 968 (1987), *cert. denied*, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); *see also Unity Ventures v. Lake County*, 841 F.2d 770, 775–76 (7th Cir.) (Seventh Circuit applies same rule to find due process claim unripe), *cert. denied*, 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988). We adopt this basic approach: the filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception. It fol-

---

12. There may be a further facet of the futility exception, applicable where the degree of hardship that would be imposed by waiting for the permit process to run its course is so substantial and severe, and the prospects of obtaining the permit so unlikely, that the property may be found to be meaningfully burdened and the controversy concrete enough to warrant immediate judicial intervention. *See, e.g., Browning-*

*Ferris Indus., Inc. v. Alabama Dept. of Env't Mgmt.*, 799 F.2d 1473, 1477–80 (11th Cir.1986). Such a situation clearly does not exist here; the properties are already being used in an economically viable way, the permit process is not alleged to be an elaborate or overly lengthy one, and the only perceptible "hardship" is the appellants' inability to maximize their profits.

lows, therefore, that the Blevins plaintiffs, having never applied for a removal permit, cannot rely on the futility exception.[13]

Moreover, there is no way, on the basis of what has been pled here, that the trustees can evade the preclusive force of noncompliance with the "one meaningful application" requirement. It strikes us as a leap of gargantuan proportions to reason that a factfinder could, on Blevins' gossamer allegations, and in light of the detailed procedures and standards set forth for permit proceedings under the Ordinance,[14] draw an inference that it would "certainly" or "nearly certainly" have been futile for Blevins to file an application in 1988. Although we understand that, in the pleading stages, a plaintiff's burden to set out facts is relatively light, we have repeatedly warned that "minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988). A reviewing court "need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation," *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990), even when such phantoms are robed by the pleader in the guise of facts. We have been particularly insistent in section 1983 cases to require a fair degree of specificity—a foundation of material facts—to survive a motion to dismiss. *See Correa–Martinez*, 903 F.2d at 53; *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983); *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978).

In this instance, appellants' didactic claim of futility, on its face, appears altogether speculative, not only because the trustees never filed even one meaningful application with the Board to convert any of their buildings to condominiums, but also because of the utter lack of other fact-dominated allegations which would serve to bring the appellants within any possible futility exception. To the extent that appellants' averments suggest that the permit process is a sham, the suggestion is a self-serving generality, counting for very little. *See Christopher W.*, 877 F.2d at 1095–96; *Association for Retarded Citizens, Inc. v. Teague*, 830 F.2d 158, 162 (11th Cir.1987). Any attempt to lean on the results of Southview's efforts seems farfetched; not only are the properties different, but appellants' counsel indicated at oral argument before us that the appellants' rekindled interest in condominium conversions very likely came about "because the economic situation ... changed" between 1980 (when the Southview applications were rejected) and 1988 (when suit was started in the district court).

In sum, the allegation of futility contained in the complaint is a matter of rank supposition. We are unable to say that the trustees have presented more than an "unsubstantiated conclusion[ ]" of the kind that our cases teach is inadequate to pass muster in the face of a motion to dismiss. *See Correa–Martinez*, 903 F.2d at 52; *see also Dartmouth Review*, 889 F.2d at 16 ("It is only when ... conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for plead-

---

**13.** Requiring one meaningful application in a situation like this one does not run afoul of the principle that exhaustion of remedies is not ordinarily essential to the commencement of an action under 42 U.S.C. § 1983. *See Patsy v. Florida Board of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982). "The question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable." *Williamson*, 473 U.S. at 192, 105 S.Ct. at 3119; *accord Tenoco*, 876 F.2d at 1025. Moreover, the

fifth amendment takes precedence, "requir[ing] property owners to utilize procedures for obtaining just compensation before alleging a taking in a section 1983 action." *Southern Pacific*, 922 F.2d at 503 n. 4 (paraphrasing *Williamson*, 473 U.S. at 194 n. 13, 105 S.Ct. at 3120 n. 13).

**14.** As these regulations were submitted as part of the complaint, they may be considered in determining a Rule 12(b)(6) motion. *See* 2A *Moore's Federal Practice* ¶ 12.07 at 12–68 (2d ed. 1990).

ing purposes."). Having never sought a removal permit, the trustees' takings claims are premature.[15]

### D. *Resort to State Procedures.*

There is a further reason why the takings claims of both groups of plaintiffs are not velivolant: they have not sought compensation through the procedures Massachusetts has provided for that purpose. The fifth amendment provides in pertinent part that "private property shall not be taken for public use, without just compensation." This provision "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987) (hereinafter, *"First Lutheran"*). For that reason, so long as the State provides an adequate process for obtaining compensation, and resort to that process holds out some realistic promise of yielding just compensation, an owner of property has no cognizable claim against the State in respect to an alleged confiscation. *See Williamson,* 473 U.S. at 194–97, 105 S.Ct. at 3120–22; *Ochoa,* 815 F.2d at 817; *Culebras Enterprises Corp. v. Rios,* 813 F.2d 506, 514–15 (1st Cir.1987). As the *Williamson* Court explained:

... because the Fifth Amendment proscribes takings *without just compensation,* no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action. *Williamson,* 473 U.S. at 194 n. 13, 105 S.Ct. at 3120 n. 13.

Appellants argue that this requirement does not apply to them because they are seeking declaratory relief, not money damages. They also contend that, since Massachusetts does not provide an adequate process for obtaining just compensation in the circumstances of this case, their claims are ripe. Neither argument withstands scrutiny.

1. *Absence of Prayer for Damages.* On the first issue, appellants assert that *Williamson, Ochoa,* and *Culebras* all involved only money damages, whereas appellants seek none.[16] They contrast these cases with earlier cases in which we suggested that, in certain circumstances, a federal court might grant a declaratory judgment as to whether or not a taking had occurred without requiring the property owner first to exhaust state compensation procedures. *See, e.g., Ortiz De Arroyo v. Barcelo,* 765 F.2d 275, 280 (1st Cir.1985); *Citadel Corp. v. Puerto Rico Highway Auth.,* 695 F.2d 31, 34 (1st Cir.1982), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Pamel Corp. v. Puerto Rico Highway Auth.,* 621 F.2d 33, 35–36 (1st Cir.1980); *see also Culebras,* 813 F.2d at 509–12. But whatever comfort these

---

**15.** For much the same reasons, even if the Southview plaintiffs could somehow avoid the time bar that inhibits their as-applied claims, *see supra* Part III(B), they would fare no better under the futility exception. The applications and denials were approximately eight years old when the Southview contingent opted to start suit. To be "meaningful," an application for administrative relief must be essentially complete, must realistically describe the desired use, and must be reasonably current (or, at least, if it has been pending for some time, the agency's rejection of it must be reasonably fresh). *See, e.g., Kinzli,* 818 F.2d at 1455 (meaningful application requirement mandates that applicants submit at least one thorough application and not abandon it at early stage); *cf. County of Yolo,* 477 U.S. at 353 n. 9, 106 S.Ct. at 2568 n. 9 ("Rejection of exceedingly grandiose development plans does not logically imply that less

ambitious plans will receive similarly unfavorable reviews."). The Southview plaintiffs have no more basis than the Blevins plaintiffs for trumpeting the inevitability of the forecasted rejection of a permit application under present conditions.

**16.** Insofar as appellants intimate that no relief apart from money damages was sought by the plaintiffs in *Williamson, Ochoa,* and *Culebras,* they are wrong. *See Williamson,* 473 U.S. at 183, 105 S.Ct. at 3114 (plaintiff awarded injunctive relief as well as damages in district court); *Ochoa,* 815 F.2d at 813 (in its complaint, plaintiff sought declaratory and injunctive relief as well as damages); *Culebras,* 813 F.2d at 508 (plaintiffs originally sought injunctive relief as well as damages).

cases once held for the proposition advanced by the present appellants has evaporated in light of the Supreme Court's developing jurisprudence.

As the district judge recognized, our underlying concern in *Pamel* and its progeny was the then-unresolved question of whether a temporary taking was compensable. *See Gilbert,* 745 F.Supp. at 53 n. 10. Within months after our decision issued in *Culebras,* the Court settled that issue. *See First Lutheran,* 482 U.S. at 321, 107 S.Ct. at 2389 (establishing that damages are retrospectively available for the period of a temporary or regulatory taking ultimately held unconstitutional by a court of competent jurisdiction). The resolution of this previously unanswered question, coupled with the Court's unambiguous declaration that there can be "no constitutional violation" under the Takings Clause until just compensation has been denied (and that, therefore, due to the nature of the constitutional right, property owners must resort to available state compensation procedures before suing under section 1983), *Williamson,* 473 U.S. at 194 n. 13, 105 S.Ct. at 3120 n. 13, leaves no doubt that, so long as the State provides an adequate process for securing compensation, federal equitable intervention in advance of resort to that procedure is premature. *Accord Golemis,* 632 F.Supp. at 164 ("the [*Williamson*] Court's ripeness analysis would be completely neutered if its holding were applied to damage claims alone").[17]

■ 2. *Adequacy of State Remedy.* This brings us to appellants' alternative argument that, even if a declaratory judgment action on a takings claim is unripe until the gauntlet of available state compensation procedures has been run, Massa-chusetts offers no remediation in this type of situation. The argument focuses upon the Massachusetts inverse condemnation statute, which says:

> When the real estate of any person has been taken for the public use ... or has been entered for a public purpose, but such taking [or] entry ... was not effected by or in accordance with a formal vote or order of the board of officers of a body politic or corporate duly authorized by law ..., and by such taking ..., entry ... or use he has suffered an injury for which he is entitled to compensation, the damages therefor may be recovered under this chapter.

Mass.Gen.L. ch. 79, § 10. The statute further provides that an aggrieved property owner may bring an action in the State's courts for an assessment of any such damages. *See id.* at § 14 ("A person entitled to an award of damages under [Chapter 79] ... may petition for the assessment of such damages to the superior court of the county in which the property taken or injured was situated.").

Appellants contend that the language of section 10 excluding takings "effected by or in accordance with a formal vote" applies to the Ordinance (which was adopted by vote of the city council), thus barring their access to an inverse condemnation remedy. Appellees, on the other hand, insist that section 10's reference to "a formal vote" cuts in only when the condemnation of property is direct, not inverse (as in eminent domain proceedings). The district court agreed with the appellees' interpretation of the statute. As the alleged confiscation here was indirect, the court concluded that "the Massachusetts inverse condemnation procedure under § 10 provides

---

17. We specifically reject appellants' suggestion that *First Lutheran,* in holding that damages were available for the entire period of an unconstitutional regulatory taking, gutted the rationale of *Williamson.* Indeed, the *First Lutheran* Court explicitly disclaimed any inconsistency between the holding there and the Court's statement in *Williamson,* 473 U.S. at 194 n. 13, 105 S.Ct. at 3120 n. 13, that "no constitutional violation occurs until just compensation has been denied." Chief Justice Rehnquist wrote for the *First Lutheran* majority:

> This statement ... was addressed to the issue whether the constitutional claim was ripe for review and did not establish that compensation is unavailable for government activity occurring before compensation is actually denied. Though, as a matter of law, an illegitimate taking might not occur until the government refuses to pay, the interference that effects a taking might begin much earlier, and compensation is measured from that time.
> 482 U.S. at 320 n. 10, 107 S.Ct. at 2389 n. 10.

the plaintiffs with an adequate means of obtaining just compensation for any alleged taking." *Gilbert,* 745 F.Supp. at 52.

We believe that the district court's construction of Chapter 79 is correct.[18] We need not probe the point, however, for a plaintiff seeking to invoke the Takings Clause in a federal court without first exhausting state remedies has the burden of proving the inadequacy of those remedies. Thus, in *Culebras,* where it was unclear whether the applicable statute would furnish plaintiffs with the "certain and adequate" relief that the *Williamson* Court contemplated, we wrote:

> Lack of clarity is not unusual ... when legal rights are still in process of definition through case-by-case adjudication.... Plaintiffs have certainly not proven the inadequacy of [Puerto Rico's] inverse condemnation remedy. We think they must pursue that remedy before they can maintain a federal damages claim, since, when fleshed out by the local court, that remedy could well provide the "certain and adequate" relief they seek.

*Culebras,* 813 F.2d at 514–15; *see also Hudson v. Palmer,* 468 U.S. 517, 539, 104 S.Ct. 3194, 3207, 82 L.Ed.2d 393 (1984) (O'Connor, J., concurring) (to prevail on a takings claim, "the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate"). We apply the same standard to the appellants. Since they have fallen well short of convincing us that their situation is outside the Massachusetts inverse condemnation remedy, and

since that anodyne, if applicable, would confer "certain and adequate" relief, the takings claims are unripe until the potential state remedy has been more fully pursued.

## IV. OTHER CONSTITUTIONAL CLAIMS

In addition to the takings claims, appellants' complaint also asserted claims for violations of the Due Process Clause and the Equal Protection Clause. We agree with the lower court that these claims are bootless.

■ As we recently said in an analogous case involving a land use ordinance, a court facing a substantive due process challenge to municipal legislation of a social or economic nature "asks only whether a *conceivable* rational relationship exists between the ... ordinance and legitimate governmental ends." *Smithfield Concerned Citizens for Fair Zoning v. Smithfield,* 907 F.2d 239, 244 (1st Cir.1990); *see also Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934) ("a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose"); *Baker v. Concord,* 916 F.2d 744, 755 (1st Cir.1990) ("if the State's objective is legitimate and the taxonomy adopted is rationally related to achieving that objective, then the law does not transgress due process"). That barrier is easily scaled in the circumstances at bar. As *Pennell* instructs, an ordinance controlling the removal of rental units is not "arbitrary, discriminatory, or demonstrably irrelevant" to its stated—and presumptively legitimate—

---

18. In arguing for an opposite result, the appellants place paramount reliance on a pair of cable television cases which show, in their view, that an inverse condemnation remedy is inapplicable to a regulatory taking unless expressly incorporated into the underlying legislative enactment. We do not believe either that these opinions stand for such a proposition or that they can carry the cargo which the appellants load on them. The first such case, *Greater Worcester Cablevision, Inc. v. Carabetta Enterprises, Inc.,* 682 F.Supp. 1244 (D.Mass.1985), neither cites to *Williamson* nor considers the impact of Mass.Gen.L. ch. 79, § 10. The second case, *Waltham Tele–Communications v. O'Brien,* 403 Mass. 747, 532 N.E.2d 656 (1989), arose

after the Massachusetts cable television statute was amended to remedy the defect perceived in *Carabetta,* 682 F.Supp. at 1247–52, by including an administrative procedure assuring compensation for takings occasioned by cable installations. In *Waltham Tele–Communications,* the Supreme Judicial Court held that the neoteric procedure was unconstitutional because it did not provide for jury determination of just compensation as required under article 15 of the state constitution. 403 Mass. at 751–52, 532 N.E.2d 656. As the court read the statute to provide an exclusive administrative remedy, it had no occasion to consider whether section 10 (under which a jury trial is available) would otherwise have provided an adequate anodyne.

goal of assuring an adequate supply of rental housing, *Pennell,* 485 U.S. at 11, 108 S.Ct. at 857 (quoting *Nebbia,* 291 U.S. at 539, 54 S.Ct. at 517), but instead "represents a rational attempt to accommodate the conflicting interests of protecting tenants ... while at the same time ensuring that landlords are guaranteed a fair return on their investment." *Id.* 485 U.S. at 13, 108 S.Ct. at 858.[19]

The appellants' equal protection claim is no more robust. The Court has stated unambiguously that laws which do not burden a suspect class or a fundamental interest will not be overturned "unless the varying treatment of differing groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the legislature's actions were irrational." *See Pennell,* 485 U.S. at 14, 108 S.Ct. at 859; *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). That is to say, absent a clear showing of arbitrariness or irrationality, an equal protection challenge to a state regulation or a municipal ordinance is doomed to failure. *Baker,* 916 F.2d at 749.

Given the applicable criteria, and the fact that, at bottom, appellants' equal protection claim is but a reformulation of their substantive due process claim, count 2 of the complaint was properly dismissed. Whether or not the Ordinance has achieved its goal of assuring an adequate supply of low-cost housing, it comes well within the wide universe of acceptable legislative choices arguably designed to advance that end. No more was exigible. *See Montalvo–Huertas v. Rivera–Cruz,* 885 F.2d 971, 981 (1st Cir.1989) ("Neither the wisdom nor actual efficacy of the legislative judgment is before us."). Hence, the notion that the Ordinance, on its face, violates appellants' right to equal protection is wholly untenable.

The district court appropriately granted the motion to dismiss the due process and equal protection claims under accepted principles of rationality review.[20]

## V. CONCLUSION

The primary thrust of our holding today is that appellants' takings claims are not timely. Their facial claims fail because of the existence of the removal permit procedure and the statutory assurance of a fair return on investment. Their as-applied claims fail because the Blevins plaintiffs have never utilized the permit process and the Southview plaintiffs utilized it too long ago. At any rate, all the takings claims are foreclosed because the plaintiffs have not invoked the State's inverse condemnation procedure in search of just compensation. It follows, then, that appellants' takings claims, being unripe for adjudication, were properly dismissed. *See, e.g., Tenoco,* 876 F.2d at 1029 n. 23 ("A determination that a claim is not ripe deprives a court of jurisdiction; there is as yet no 'case or controversy' as required by Article III of the federal Constitution."). The due pro-

---

**19.** Given *Pennell's* teachings, and the nexus between substantive due process and socioeconomic legislation as charted in other recent Supreme Court opinions, *e.g., Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 462–63, 108 S.Ct. 2481, 2489–90, 101 L.Ed.2d 399 (1988); *Hodel v. Indiana,* 452 U.S. 314, 330–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981), appellants' reliance on our forty-year-old holding in *Rivera v. R. Cobian Chinea & Co.,* 181 F.2d 974 (1st Cir.1950) (finding that a statute prohibiting an owner from withdrawing his property from the rental market for his own use constituted a violation of due process), is misplaced. Though *Rivera* has not heretofore been expressly overruled, time has passed it by. As we said in our 1989 decision in *Tenoco,* "[f]or the last half-century, courts have upheld challenged governmental acts unless no reasonably *conceivable* set of facts could establish a rational relationship between the regulation and the government's legitimate ends." 876 F.2d at 1022 n. 15. *Rivera* stands at odds with a now venerable body of due process jurisprudence and is no longer the law of this circuit.

**20.** Where, as here, due process and equal protection sorties comprise the same basic claim under two different labels, the same ripeness criteria apply to both claims. *See Eide,* 908 F.2d at 724 n. 12 (listing cases). In this instance, both such claims were, of course, unripe, *see Pennell,* 485 U.S. at 11 n. 5, 108 S.Ct. at 857 n. 5; *Williamson,* 473 U.S. at 199–200, 105 S.Ct. at 3123–24; *Eide,* 908 F.2d at 723–27; *Unity Ventures,* 841 F.2d at 775; *Herrington,* 857 F.2d at 569; *Culebras,* 813 F.2d at 515, and thus, subject to dismissal on that ground as well.

cess and equal protection claims were insufficient for the reasons stated, *see supra* Part IV, and were likewise appropriately dismissed. As for the state-law claims, they fall in tandem with their federal counterparts to the extent that they are correlative. To the extent that the state-law claims may be viewed as independent, those claims, including but not necessarily limited to count 3 of the complaint, were properly dismissed for want of subject matter jurisdiction under the rule of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial ..., the state claims should be dismissed as well."); *accord Brennan v. Hendrigan*, 888 F.2d 189, 196 (1st Cir. 1989).

We need go no further.[21] The plaintiffs waited nearly a decade after the Ordinance was enacted before deciding to enter the federal courts. Once they determined to do so, they were then too hasty, essaying a rush to judgment without due recourse to either the permit process or the State's inverse condemnation procedure. Having chosen not to follow the accepted routes, the plaintiffs are becalmed. They cannot now expect a federal court to nurture their claims through a trial or to be tempted by unripe fruit into a premature consideration of potentially important constitutional issues—issues which may or may not actually materialize.

*Affirmed.*

---

**21.** Having concluded that the takings claims must be dismissed for lack of jurisdiction, we need not address defendants' argument that the district court was required to abstain under the principles of comity enunciated in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). By the same token, we do not reach the district court's alternative holding that the appellants' claims should be dismissed in the proper exercise of judicial discretion. *See Gilbert*, 745 F.Supp. at 53–56.