RENDELL, Circuit Judge,
dissenting with whom McKEE, Chief Judge and KRAUSE Circuit Judge join:
I respectfully dissent from Part IV.A of the majority’s opinion. The majority’s reasoning as to why CAFRA’s nonjudicial forfeiture provisions do not apply here is at best cryptic and, at worst, sets an incorrect and dangerous precedent that would allow the Government to nullify CAFRA’s provisions at will. In effect, the majority holds that the Government did not commence a nonjudicial forfeiture proceeding, and thus avoided the dictates of CAFRA, based mainly on its buy-in to the Government’s audacity — the Government’s say-so that it owned the 1933 Double Eagles and had no intention of forfeiting them. But in reaching this unprecedented result, the majority not only disregards how CAFRA works and what actually happened here, but also renders CAFRA’s protections largely meaningless and defies Congress’s intent in passing the statute.
I.
This case involves precisely the type of situation that CAFRA was enacted to prevent: the Government’s seizing and taking ownership of property in derogation of the rights of ordinary citizens. Indeed, Congress passed CAFRA to “level[ ] the playing field between the government and persons whose property has been seized.” United States v. Real Prop. in Section 9, 241 F.3d 796, 799 (6th Cir. 2001). To that end, CAFRA imposes deadlines on the Government for commencing a nonjudicial forfeiture proceeding of seized property and for filing a judicial forfeiture action in response to a citizen’s timely claim to that property — not to mention deterrent penalties for missing those deadlines.
A nonjudicial forfeiture proceeding under CAFRA is not a “proceeding” in the true sense of the word, but, rather, a statutory scheme. That scheme is commenced when the Government seizes property and notifies all interested parties within “60 days ... of the seizure,” 18 U.S.C. § 983(a)(l)(A)(I), that it intends to keep the property as its own “without the trouble and expense of court proceedings,” Small v. United States, 136 F.3d 1334, 1335 (D.C. Cir. 1998). If no one submits a timely claim to the property in response (known as a “seized asset claim”), the Government can issue a “declaration of forfeiture ... [that has] the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding in a district court of the United States.” 19 U.S.C. § 1609(b). But if someone asserts a timely seized asset claim, the nonjudicial forfeiture proceeding ceases, and the Government has 90 days to file a judicial forfeiture action, 18 U.S.C. § 983(a)(3)(A), in which it then bears the burden of proving its right to the property, id. § 983(c)(1). If the Government does not file a timely action, though, it must “promptly release the property ... and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.” Id. § 983(a)(3)(B).[1]
*208 The majority ignores how CAFRA’s scheme applies here — notwithstanding that the events fit within it in lockstep. The Government seized the 1933 Double Eagles when it failed to honor the Langbords’ July 25, 2005, letter requesting their return and instead “decided to keep [them] for [its] own purposes.” Langbord v. U.S. Dep’t of Treasury, 645 F.Supp.2d 381, 392 (E.D. Pa. 2009). Next, on August 9, 2005, within 60 days of seizing the 1933 Double Eagles, see 18 U.S.C. § 983(a)(l)(A)(I), the Government sent a letter to the Langbords notifying them that it intended- to keep these items — without a court proceeding— because they allegedly “already are, and always have been, property belonging to the United States.” App. 823.[2] To be sure, in this letter the Government disclaimed any intent to forfeit the 1933 Double Eagles. See id. But this statement alone cannot preclude the letter from constituting notice of the Government’s intent to non-judically forfeit them. See 18 U.S.C. § 983(a)(1)(A)(I) (requiring only that “notice shall be sent in a manner to achieve proper notice”); Stefan D. Cassella, Asset Forfeiture Law in the United States 173 (2d ed. 2013) (“Section 983(a)(1)(A)(i) is silent as to the content of the notice.”). And in response to this notice, the Lang-bords filed a timely claim, terminating the nonjudicial forfeiture proceeding and triggering the Government’s obligation to file a judicial forfeiture action within 90 days and prove its right to the 1933 Double Eagles. But it did not.[3]
The majority concludes that the Lang-bords failed to trigger the 90-day deadline with their seized asset claim because the Government chose not to initiate forfeiture proceedings against the 1933 Double Eagles. It reasons that “the Government determined that it was not obliged to initiate forfeiture proceedings against the 1933 Double Eagles because it had merely repossessed its own property” and “[i]n fact ... explicitly disclaimed any intent to forfeit the[m].” Majority Op. 182. Instead, the majority notes, “the Government asserted its ownership rights to the coins.” Id. 17. It thus holds that the Government never took any steps to commence a nonjudicial forfeiture proceeding against the 1933 Double *209 Eagles, and so the Langbords’ seized asset claim was “mismatched” and “ineffective,” likening it to the filing of a writ of habeas corpus on behalf of someone not in custody. Id. 18.[4]
But that approach enables the Government to nullify all of CAFRA’s protections merely by asserting its ownership of property and lack of intent to forfeit that property. Congress cannot have intended this result. See Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202 pmbl. (CAFRA’s purpose is “[t]o provide a more just and uniform procedure for Federal civil forfeitures”); United States v. Khan, 497 F.3d 204, 208 (2d Cir. 2007) (Congress passed CAFRA “to deter government overreaching”); United States v. Martin, 460 F.Supp.2d 669, 672 (D. Md. 2006) (“CAFRA was enacted in 2000 to curb what Congress perceived as abuses of the existing civil forfeiture system.”). Rather, to stay true to Congress’s intent, we must focus on what actually occurred here: the Government seized property that is, by statute, subject to forfeiture, see supra note 2, with the intent to keep that property permanently and without a court proceeding, and so notified the Langbords. Clearly, then, a nonjudicial forfeiture proceeding was in process before the Lang-bords filed their seized asset claim, which should have triggered the filing of a judicial forfeiture complaint by the Government within 90 days, see 18 U.S.C. § 983(a)(3)(A).[5]
Accordingly, because the Government’s failure to file a judicial forfeiture action within 90 days of the Langbords’ timely seized asset claim barred it as a matter of law from taking any further action to forfeit the 1933 Double Eagles, see 18 U.S.C. § 983(a)(3)(B), the District Court erred in permitting the Government to later file its declaratory -judgment and judicial forfeiture actions.[6] Instead, the District Court *210 should have ordered the 1933 Double Eagles returned to the Langbords pursuant to the statutory directive. I would therefore reverse the District Court’s order.
II.
But we must address another issue as to the applicability of CAFRA’s nonjudicial forfeiture provisions here. Even though the Government’s seizure and notice usually commence the nonjudicial forfeiture scheme, some property is ineligible for nonjudicial forfeiture. The Government has urged that the 1933 Double Eagles are ineligible for nonjudicial forfeiture because they are “merchandise” whose value “exceed[s] $500,000” and not “monetary in-strumentfs].” 19 U.S.C. § 1607(a); id. § 1610. If that is true, the Langbords’ seized asset claim would have been ineffective to trigger the 90-day deadline. See 18 U.S.C. § 983(a)(2)(A) (claim can be filed only by a “person claiming property seized in a nonjudicial civil forfeiture proceeding”). And, thus, the judicial forfeiture initiated by the Government in 2009 would have been timely because § 983(a)(3)(A) did not apply.
This issue should give us pause. The definition of “monetary instruments” includes, among other things, “United States coins and currency,” “travelers’ checks,” and “bearer securities.” 31 U.S.C. § 5312(a)(3). Did Congress intend that “monetary instrument” should encompass only currency in circulation and liquid assets that constitute substitutes for currency? See H.R. Rep. No. 91-975, at 22 (1970) (discussing a statute requiring domestic financial institutions to report certain transactions involving “monetary instruments” and stating that “[i]t is not the intention of your committee ... that [monetary instruments] be expanded any further than necessary to cover those types of bearer instruments which may substitute for currency”). On the other hand, the 1933 Double Eagles are rare, uncirculated coins whose seemingly immense value derives from their status as collector’s items. Viewed in this way, they would be not monetary instruments but, instead, merchandise possibly worth over $500,000, which is ineligible for nonjudicial forfeiture.
This is a threshold issue that must be decided — one that cuts to the very applicability of CAFRA’s nonjudicial forfeiture scheme.[7] Nevertheless, although it was presented to the District Court, it was never addressed there, let alone decided. We should therefore remand to the District Court for it to make the initial ruling on this issue.[8]
*211 Thus, I urge that CAFRA’s nonjudicial forfeiture scheme was set in motion here and would require that the 1983 Double Eagles be returned to the Langbords under 18 U.S.C. § 983(a)(3)(B). But that result should follow only if the District Court decides that CAFRA’s nonjudicial forfeiture scheme even applied to them. I suggest that remand is the appropriate disposition in the first instance and, therefore, respectfully dissent.

. The cases cited by the majority, though not decided under CAFRA, confirm that the nonjudicial forfeiture scheme generally operates this way. See, e.g., Taylor v. United States, 483 F.3d 385, 387-88 (5th Cir. 2007); United States v. Miscellaneous Firearms, 376 F.3d *208 709, 711 (7th Cir. 2004); United States v. Dusenbery, 201 F.3d 763, 765-66 (6th Cir. 2000); Boero v. DEA, 111 F.3d 301, 304 (2d Cir. 1997); Floyd v. United States, 860 F.2d 999, 1008 (10th Cir. 1988).

. It is indisputable that allegedly stolen Government property is subject to forfeiture. See 18 U.S.C. § 981(a)(1)(C) (property is subject to forfeiture if it "constitutes or is derived from proceeds traceable to ... any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)”); id. § 1956(c)(7)(D) ("[SJpecified unlawful activity” includes "an offense under ... section 641 (relating to public money, property, or records)”); id. § 641 (criminalizing the theft or embezzlement of any "thing of value of the United States or of any department or agency thereof”).

. Consider what would have happened if the Langbords had not filed a timely seized asset claim but had filed a replevin action a few months after the Government’s notice. Despite the Mint’s stated position that it was not seeking forfeiture, is there any doubt that it would have argued that the Langbords were barred under CAFRA from claiming the 1933 Double Eagles because they had been nonju-dicially forfeited due to the Langbords' failure to file a timely seized asset claim? The Government cannot have it both ways.
Indeed, I suggest that the Mint’s statement that it did not intend to pursue forfeiture proceedings meant that it did not intend to file an unprompted judicial forfeiture complaint. Every agency involved in this saga other than the Mint advised the Mint that it should bring a judicial forfeiture action from the outset. See App. 818. Yet the Mint decided not to do so and instead commenced a nonjudicial forfeiture proceeding by notifying the Langbords that it intended to keep the 1933 Double Eagles without any court proceeding.

. The majority's second line of reasoning relies on two cases, Mantilla v. United States, 302 F.3d 182 (3d Cir. 2002), and United States v. $8,221,877.16 in U.S. Currency, 330 F.3d 141 (3d Cir. 2003). These non-CAFRA cases support the unremarkable proposition that a seizure does not necessarily commence a forfeiture proceeding, and they do not determine the outcome of this case.

. The Government's claim that the 1933 Double Eagles belong to the United States, after all, is just that, and the validity of that claim is the very question to be answered by a forfeiture proceeding, not by the Government's say-so. That CAFRA expressly provides for an “innocent owner defense,” see 18 U.S.C. § 983(d)(1) (providing that "[a]n innocent owner’s interest in property shall not be forfeited under any civil forfeiture statute”), drives home that where there is any colorable claim of a legitimate property interest by the claimant-possessor, the validity of the asserted interest needs to be determined through a forfeiture proceeding. Allowing the Government’s self-declaration of its own property interest to be conclusive puts the forfeiture cart before the horse. Were it otherwise, the Government might well assert that its preexisting title to seized property enables it to avoid CAFRA in any number of situations. See, e.g., id. § 981(f) ("All right, title, and interest in property described in subsection (a) of this section [i.e., forfeitable property] shall vest in the United States upon commission of the act giving rise to forfeiture under this section.”); but cf. United States v. 92 Buena Vista Ave., 507 U.S. 111, 124-29, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (plurality opinion) (explaining that an identical provision in 21 U.S.C. § 881(h) does not confer title until forfeiture has been decreed).

.I respectfully disagree with Judge Jordan's view in his concurrence that, even if the Government violated CAFRA's 90-day deadline, it was still permitted to bring its declaratory judgment action seeking to quiet title to the 1933 Double Eagles. He and the majority justify the Government's declaratory judgment action because it was purportedly based on a legal theory independent of the forfeiture claim. At bottom, though, in both claims, the Government sought to quiet title to the 1933 Double Eagles. See United States v. McHan, 345 F.3d 262, 275 (4th Cir. 2003) ("[T]he *210 purpose of a quiet title action is to determine which named party has superior claim to a certain piece of property.” (internal quotation marks omitted)). The forfeiture claim and declaratory judgment action were thus “essentially predicated upon the same cause of action," Algrant v. Evergreen Valley Nurseries Ltd. P’ship, 126 F.3d 178, 185 (3d Cir. 1997), and because the Government was not permitted to "take any further action to effect the civil forfeiture of such property,” 18 U.S.C. § 983(a)(3)(B) (emphasis added), as a matter of law it was not allowed to circumvent CAF-RA’s 90-day deadline "by '[djraping [its] claim in the raiment of the Declaratory Judgment Act,’ ” Algrant, 126 F.3d at 185 (quoting Gilbert v. City of Cambridge, 932 F.2d 51, 58 (1st Cir. 1991)).

. See, e.g., In re Funds on Deposit, 919 F.Supp.2d 169, 174-75 (D. Mass. 2012) (holding that CAFRA’s nonjudicial forfeiture scheme did not apply because the Government seized property that was ineligible for nonjudicial forfeiture under 19 U.S.C. §§ 1607(a) and 1610).

. The District Court would decide (1) whether the 1933 Double Eagles are merchandise or U.S. coins and currency; and (2) if merchandise, whether they are in fact worth over $500,000. While there is evidence in the rec *211 ord suggesting this valuation, it was never an issue that was vetted or decided in the District Court.